Good morning, Your Honors, and may it please the Court. My name is Andrea Byrd. I'm pro bono counsel for Manatt, Phelps & Phillips, and I represent the petitioner, Aideen Kary Avendano-Hernandez. I'm reserving five minutes of my time for Karen Zwick, Amakai Counsel, and I will reserve two minutes for my rebuttal as well. Your Honors, this case is about the agency incorrectly applying the law to deny relief to Aideen, a transgender woman who was brutally raped and beaten by armed and uniformed Mexican police and military officials on two different occasions in two different geographic locations in Mexico because of her gender identity and perceived sexual orientation. Now, we've got three matters, as you know, on calendar today involving similar issues. Right off the bat, there's no asylum issue in this case, so the application was only withholding and CAT, correct? That's correct, Your Honor. And what do we do with the particularly serious crime finding with regard to withholding? Well, Your Honor, the particularly serious crime issue, we would urge the court to remand on that issue for an individualized finding. On the other hand, on the CAT issue, we would ask the court to reverse the agency's denial of deferral of removal under CAT because the BIA did not apply the correct law, and when analyzed under the correct law, Aideen has conclusively established that she's eligible for the CAT relief. All right, back on the withholding. As you know, we don't have jurisdiction to reweigh the factors that the BIA and the IJ looked at because it's a discretionary finding by them unless there's an incorrect standard applied. So what's your argument that gives us jurisdiction to even look at that issue? Yes, Your Honor, I understand. Your Honor, we're not asking you to reweigh the evidence. We're asking that you tell the judge to weigh the evidence. In this case, the IJ, rather than making an individualized finding, paid lip service to the factors but just immediately went to the Inayah Ortiz case and said, well, this is the same as Inayah Ortiz, so she therefore committed a particularly serious crime. That's one of the errors. The other errors that the IJ looked in the sentencing looked at a three-year sentence rather than a slightly less than one-year sentence. The one-year sentence was for the actual crime committed. The two years was for the probation violation, which was her returning from Mexico. So in this case, even though there was lip service paid, there was no individualized analysis done. And Aideen's DUI was different than Inayah Ortiz's case. She was drinking to cope with childhood memories of her sexual abuse. She has not had a drink since that night, and she was not found to be driving recklessly or speeding. The injury to the passenger was minor. While in Inayah Ortiz, the applicant crashed through a house, caused great bodily injury to an elderly woman who was sitting on her couch. We would just admit that those facts should have been considered. And the agency also made two reversible errors in its CAT analysis. And the major one that we've touched on a little bit today, but CAT doesn't require acquiescence of government when the government's own actors committed the torture. And the second error is that both the BIA and the IJ failed to give reasoned consideration to all of the evidence on the record, including an expert declaration that specifically addressed the country conditions that Aideen, as a transgender woman, would face if she returns to Mexico. The BIA and IJ also ignored voluminous country conditions evidence of ongoing flagrant and gross human rights violations. Now, with regard to the acquiescence issue, both the incident with the police and the military officers, they were uniformed. That's correct, Your Honor. And the police actually were in the middle of working a checkpoint when they followed down the road. And for the military, was there an indication that they were patrolling the border? Well, there's nothing on the record saying that they were patrolling the border, but she was attempting to cross the border, and I think the reasonable explanation for 12 military officials to be wandering around at the border is that they were patrolling the border. But for those positions that they were in, their positions of power, both the military patrolling the border and the police officers who were manning that police checkpoint, if it weren't for their positions of power doing those things, Aideen wouldn't have even encountered them. So they were acting as government actors. And the government's attempting to impose on Aideen the requirement of demonstrating that some higher echelon of government had advanced knowledge of what these police officers and military soldiers did to her. It would make it next to impossible for anyone to obtain cat relief if we made that the standard. It would basically eviscerate the purpose of cats. And I would just remind the court, these were 16 officials total, so even if acquiescence was required, the agency should have found that acquiescence was there because each attack on her involved multiple state actors who stood by and witnessed the actions of the other state actors that were torturing Aideen. These officers and soldiers that stood by were acquiescing. But again, it's not even required. And in this case, I'm quoting Nehru, because we've shown that, I'm not quite quoting yet, because we've shown that Aideen suffered torture, and she did have a credibility finding that she was credible, and here's the quote, if an individual has been tortured and escaped to another country, it is likely that he will be tortured again if returned to the site of his prior suffering, unless circumstances or conditions have changed significantly, not just in general, but with respect to that particular individual. End quote. Here, the rapes and other violence that Aideen suffered was at the hands of the government actors and therefore constituted torture. So she's demonstrated that she's likely to suffer torture again if she returns to Mexico, unless the record shows significant changes with respect to her particular case. And, Your Honors, neither the BIA nor the IJ specifically considered all of the evidence on record. For example, there was an expert declaration submitted in this case, and neither the IJ nor the BIA even mentioned that expert declaration in their orders. Under COLE, the BIA must give reason to consideration where potentially dispositive testimony and documentary evidence is submitted. The COLE Court reversed, because the BIA did not state reasons in the record why the expert testimony was insufficient to establish probability of torture necessary under CACT. The BIA and IJ also failed to give reason consideration to the voluminous documentary evidence submitted in support of Aideen's position that country conditions have not changed. And I would direct the Court to both the expert declaration and the bullet points on page 27 of our opening brief. But specifically, the expert said, if Aideen, quote, were forced to return to Mexico, it remains highly likely that members of the Mexican police and military forces would find, harass, beat, torture, and even kill her, either in the short or the long run, on account of her gender identity. The BIA and IJ just completely failed to give reason consideration to this. And in contrast to Aideen's country conditions evidence, which demonstrates the abuse Aideen will likely suffer at the hands of Mexican government actors and the public, the government's country conditions evidence addresses specific rights that don't apply to Aideen. We've mentioned them earlier in the day today. The government submitted evidence that parts of Mexico allow gay conjugal visits or allow same-sex marriage or allow transgender individuals in Mexico City to change their birth certificates or let gay people to office. But Aideen is not seeking to change her birth certificate or to run for office or to have a conjugal visit. She simply wants to live her life as a woman without being in danger of being tortured. Can I have you address the withholding claim again for a moment? If we find that the only error that the IJ made was in the reference to the sentences that was imposed for the UI conviction, is that enough to send it back or do we have to subject that to a harmless error analysis? Well, Your Honor, I believe that it would not be harmless error. There's a big difference. It's a 200% difference between 3 years and 1 year, slightly less than 1 year. It was a day less than 1 year. When you're looking at how serious a crime is, looking at a sentence that's 3 times longer than the original, than what the actual sentence is that you're supposed to be considering, that's a significant factor. And the length of the sentence is a factor that needs to be considered and if we discount that factor, then there's no purpose to having that factor in the first place. What's the standard of review on this issue? On the particularly serious crime issue, the standard of review is abuse of discretion and the agency abused its discretion by incorrectly applying the law. And you're arguing the second prong. Are you arguing both prongs? Of the withholding of removal? Yeah. We're arguing that she did not commit a particularly serious crime. So, in so concluding, involved in abuse of discretion? Exactly, Your Honor, yes. And the reason that we're not arguing about any finding of past persecution or future persecution is that the IJ did not reach that analysis because of the particularly serious crime. Why was that an abuse of discretion? It was an abuse of discretion because she failed to follow the law in doing an individualized analysis and in using the wrong time frame and using the wrong sentence. It should have been a 364-day sentence that was considered in that factor and instead she considered three years because she added on the two years for a dean's probation violation, which was when a dean returned from Mexico a few years after she was here, she was picked up for a probation violation and that probation violation was coming back to the United States. So your argument is the IJ weighed improper evidence and so therefore to send it back for redo? That's correct, Your Honor. All right. Did you want to yield a little bit of your time? I would, Your Honor. Thank you. Can you see me okay? Yes. There's a box for me, but I don't see it. You might want to pull the microphone down a bit. Okay. Your Honors, my name is Karen Zwick and I'm counsel for the National Immigrant Justice Center representing AMICI. Collectively, our six organizations have represented more than 1,200 lesbian, gay, bisexual, and transgender asylum seekers across the country and our testimony here today is relevant from that experience, The first thing that I want to address with you all is the reason why we took the step to seek argument time here today. As you have gathered, all three of these petitioners appeared while detained at the Santa Ana City Jail. All three of them appeared before the same immigration judge. Santa Ana City Jail is the only facility in the entire country with a pod dedicated to housing gay men and transgender women and those individuals have a higher likelihood of seeking protection-based claims given the country conditions around the world for people who are members of the LGBT community. Yet that facility has no phone access and there's a very limited ability to obtain counsel there. And also there are only three judges who hear cases from that facility which means that given the frequency with which those judges hear those cases, they've had more occasion than any other adjudicator in the country to adjudicate claims brought by transgender women and the frequency also means that it's very important for them to understand what it means to consider a claim brought by a transgender woman. And that brings me to my second point, Your Honors, which is that Ms. Carmichael's position in the first case was that the BIA and the IJ did understand that those petitioners were transgender women but the record in this case makes it very clear that that was not true. This court, of course, requires individualized analysis of all protection-based claims, but instead of giving that analysis to Ms. Avendano, the judge focused on reforms that are applicable to gay men and that are largely irrelevant to transgender women. Many other people have stood here before you today and sort of talked about the conditions, so I will not belabor all of the country conditions issues in Mexico except to say that this record makes it very clear that between 65% and 75% of transgender women have reported to experience violence and that the most frequent form that that violence takes is sexual in nature. I wish that I could say that the experiences of these three petitioners were rare in Mexico, but the experiences of my organization and the other organizations I'm here before today shows that that's exactly the opposite of true. This is exactly the kind of thing that happens with a great amount of frequency in Mexico. Your Honors, we understand that the language used to refer to members of the LGBT community is evolving and can be confusing, so our problem is not only that this judge refused to refer to this petitioner as a woman and used female pronouns to refer to her absent, quote, direct review otherwise, and our problem is not only that the judge equated her request to use female pronouns as if she were asking that the court refer to her using a stage name like Pee Wee Herman. Rather, our complaint has more to do with the fact that in addition to refusing to refer to the applicant by the preferred pronouns, the judge doesn't seem to understand the difference between what it means to be a transgender woman and a gay man, and that difference is, of course, crucial. Social attitudes in Mexico are very different than those in the United States. Even the reforms that the judge cited to... the reforms that the judge cited to have not had any meaningful results in the changes of the lived experiences of transgender individuals. In fact, the record shows that even after those changes have been implemented, year after year after year, the murder rate of transgender individuals has increased across the country, and that there has been substantial backlash against members of the LGBT community. So, you know, in conclusion, Your Honors, this court has a very important opportunity today to make a decision that sets forth some very basic guidance for the immigration judge and the Board of Immigration Appeals. The court should first help clarify that being gay and being transgender are not the same thing, and it is a mistake for a judge to decide a case involving a transgender woman as if she were a gay man. As Petitioner's Counsel said, the court should also make it very clear, and as Judge Parker's comments in the first case make very clear, that top-level government reform is not required and is not dispositive if it is not accompanied by a change in social attitudes. And finally, torture by police officers is torture. It does not require the applicant to show high-level government actors. Thank you, Your Honors. Thank you very much. Let's hear from the government. Good morning, Your Honors, and may it please the court. Cori Farrell, on behalf of the Attorney General. I would like to start by addressing the particularly serious crime determination. In this case, the agency went through the individualized case-by-case analysis required, considering the nature of the crime, the circumstances surrounding the conviction, and the sentence imposed. It does seem like the court erred in looking at the sentence imposed. The immigration judge did refer to the three-year sentence, which included the probation violation, but she also said correctly that the original sentence was 364 days in jail, which she said is significant. And that's on page 120 and 121 of the record. So she did consider the original sentence on its own as significant. That's a misdemeanor sentence, all right. The crime is a felony. The record shows that she was convicted of a felony, although she was sentenced to 364 days in prison and three years of probation.  the government's position is that remand would be futile for that issue because the immigration judge did say that that original sentence on its own was significant. So the IJ said that the original sentence of 364 days, which in and of itself is a significant sentence, therefore the court finds that the original sentence plus the enhanced sentence both indicate that it is a particularly serious crime. And so the conclusion is the wrap-up, so to speak, is really based on the two-year sentence plus a 364 sentence. So I take it that the government's argument is that it's harmless. It is, and I think that that sentence could be read, too, that both sentences are significant, but it is harmless there, and the immigration judge did consider the original sentence, although admittedly she did consider the second sentence as well. But yes, Your Honor, the government's position is that it is harmless there. All right, let's talk about Pat. Okay. Here the agency determined that Petitioner failed to meet her high burden of proving eligibility for deferral of removal. She was credible, and she experienced horrific harm in Mexico. There's no dispute about that. However, the agency determined that the harm she experienced was general harm that was committed by police officers and military, although not acting in their official capacity. Well, what does that mean? There's not a lot of case law, Your Honor, on what exactly it means to be acting in an official capacity. The Eighth Circuit in Ramirez-Pero listed some factors that the court thought would be relevant to consider, such as whether the official was on duty, in uniform, what their duties were, and they found significant whether that person had access to Petitioner because of their official position. All those criteria it seems like are met here. The police and the military. Aren't they? I don't believe it's clear that they're all met here. Which are not? Well, we don't know whether they were performing official duties. They were wearing uniforms. Well, sure we do. They were manning a checkpoint. I don't know. It doesn't seem that the record is entirely clear that it was the same people at the checkpoint. She was not stopped at the checkpoint.  Petitioner testified that she continued walking past the checkpoint and was overtaken on a dirt road after she'd been walking past the checkpoint. By these policemen? By policemen, yes, Your Honor. By the policemen who were manning the checkpoint? I don't know if that... That's how I read the record. Does the government see it differently? No, and no findings were made on that, Your Honor. So we can assume that it was the policemen from the checkpoint. So how is that not acting in official capacity? You're in uniform, you're working, and then she passes by, they follow her down the road, and that's when the assault took place. That seems to be acting in official capacity to me. Well, Your Honor, this court and the board have never held that wearing a uniform alone transforms a crime. What else could it possibly be? I mean, what, they were playing basketball? What else could it be but official capacity? I don't quite follow the government's argument here. Your Honor, the agency determined that it was not in official capacity. Right. But the government's here defending that, so I want to know your theory as to why this is not policemen acting in their official capacity when they're in uniform working a checkpoint. And she was not detained, they did not identify themselves, they stopped where the police, they did not have access to her because of their official duties. There are some cases where police have arrested someone and they are detaining them and they have access to petitioner in that way. So there are numerous factors to consider. And the military officers, there's no testimony that they were patrolling the border at that time. Isn't that a fair inference? It could be a fair inference, but the petitioner did not testify that these men were patrolling the border. When she was asked why she believed they were military officers, she testified only because they wore uniforms like the military. So what's a whole bunch of military officers doing at the border if not working there? Your Honor, I can't speculate to that. Or even if they were official military officers as opposed to vigilantes dressed in uniform. We don't know what they were doing. This I.J. in this case found, while acknowledging that this person provided credible evidence that she'd been assaulted and raped, felt this was insufficient to show acquiescence because, quote, the actual Mexican government did not assault her and in fact was making strides to protect the rights of the transgendered and homosexual population. In this context, what do you think the actual Mexican government referred to? The actual Mexican government? What's the actual Mexican government? What does that mean? It could mean the rest of the police force or the military or it could mean higher up. It is not clear. You're having as much trouble with that as I am. I am, Your Honor. We had discussed with your colleague, Ms. Carmichael, regarding the country reports and really what appears to be the BIA's failure to appreciate the differences between the two groups, the group of gay men that we address in Castro-Martinez versus transgender individuals, transgender women, as these petitioners are. Do you have anything to add to Ms. Carmichael's arguments? I would just like to point out that in this case the agency I don't believe relied on Castro-Martinez and did perform an individualized analysis. And as Miki Counsel has pointed out, the terminology used is evolving and the understanding is evolving, but also much of petitioner's evidence, including the expert affidavit in the record, refers to sexual minorities, which does group transgender women and homosexuals in the same category. And the agency in this case did recognize that she was identifying as a transgender woman. Is there anything in the country reports that talks specifically about transgender individuals and the protections afforded to that population? As Miki Counsel mentioned, or no, as Petitioner's Counsel mentioned, I'm sorry, there is evidence that Mexico City gave transgender individuals more civil rights by allowing them to change their name on their birth certificates. And I understand that that is not the issue in this case. And that there's a 2010 report by the International Gay and Lesbian Human Rights Commission which states that Mexico has recently seen increased protection of the rights of LGBT persons. And on page 37 of the government's brief, we identify some of that evidence. But there is a lot of evidence in this case. And there is some evidence referring only to protections to transgender individuals as well as homosexuals. Counsel, one of the petitioners indicated that actually the increase in legal protections led to a backlash. And so there's greater violence in many instances than before. Do you think that the BIA should have looked at that? Not in this case, Your Honor, because that issue was not raised before the board. In fact, in Petitioner's brief to the board, she actually argued that things had not changed at all for transgender women. So in this case, it would not be appropriate for the board to look at that because it was not presented to it. Would the government in this case be upset? Let me ask it a different way. Would the government be helped if we clarified the difference between these categories? I do think that it would help the agency better adjudicate these cases if there was more case law and more clarification. I think it would also help petitioners in submitting evidence and having cases to rely on. If there are no further questions, Your Honors. Thank you very much, Ms. Brown. Thank you. Thank you, Your Honors. I just want to make one note. I think you're over time, but let's put a minute on the clock. Thank you, Your Honor. I'll just make a few quick points. First, for the particularly serious crime issue on the sentencing, if all felonies that were a year were particularly serious, then the statute would save, though. And in this case, the only per se particularly serious crimes are aggravated felonies that have five or more years for a sentence. So it does make a big difference, whether it's three years you're looking at or one year. I also wanted to point out that for the particularly serious crime, the mere possibility of harm is not enough to make it a particularly serious crime, and that's one of the things that the IJ relied on, is that a DUI could cause particularly serious injuries to people. And also the fact that the driver of the other vehicles actually were injured. The driver did have minor injuries, yes, Your Honor. The other thing is that the analysis also requires showing that a person is a danger to the community. So the IJ should have also considered that Mrs. Avendano stopped drinking, and that was relevant. She hasn't had a drink since then. But in closing, I just urge the Court that you don't even have to look at the particularly serious crime for our intents and purposes. If you reverse on the cat finding and order the IJ to grant deferral of removal under cat so that Aideen doesn't have to return to Mexico where she's likely to be tortured or killed. Thank you, Your Honor. Thank you very much. I think I've got this. So the same IJ in all three of these cases? Yes, Your Honor. Judge Munoz, Your Honor. Munoz, Your Honor. Yes, Your Honor. Thank you for your time. All right, thank you very much. Thank you all very much. We appreciate the arguments by everyone. Very well argued. And we also appreciate the pro bono representation of the petitioners in these cases. Very helpful arguments. Thank you.
judges: Pregerson, Parker, Nguyen